NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

NOVOTEC PHARMA, LLC,

Plaintiff,

v.

GLYCOBIOSCIENCES, INC.,

Defendant.

Civ. No. 15-1315

**OPINION**

THOMPSON, U.S.D.J.

      This matter appears before the Court upon the Motion of Plaintiff Novotec Pharma, LLC for Preliminary Injunctive Relief against Defendant GlycoBioSciences, Inc. (ECF No. 2.) Defendant opposes. (ECF No. 37.) On July 28, 2015 this Court conducted a hearing on the Motion. (ECF No. 39.) After reviewing the parties' written submissions and oral arguments, the Court will deny Plaintiff's Motion.

## BACKGROUND

      Given the extensive filings on this matter, the Court will recite only those facts pertaining to the present motion. This case involves a pharmaceutical contract dispute between Plaintiff, located in New Jersey, and Defendant, located in Ontario. The parties were introduced in September 2014, and shortly thereafter on November 26, 2014 they executed a Distribution Agreement ("DA") whereby Plaintiff would be granted the exclusive right to market and distribute Defendant's wound gel in the United States for five years. Under the DA, Plaintiff orders batches of the wound gel from Defendant; Defendant arranges for the wound gel's manufacture by a contract manufacturing organization ("CMO"); then the wound gel batches are shipped to a third party logistics provider ("TPL") chosen by Plaintiff for distribution. Allegedly

only three CMOs in the world currently have the capacity to manufacture Defendant's wound gel: Bioglan AB (in Sweden), Woodfield Pharmaceutical, and WellSpring Pharmaceutical.

Problems arose between the parties soon after the DA was signed. On December 1, 2014 Plaintiff ordered and paid for its first three batches of wound gel. However, Bioglan, the CMO Defendant had contracted with to manufacture the wound gel, issued a letter on December 17, 2014 formally terminating all agreements and commercial relationships with Defendant except as to the three batches of wound gel. Bioglan's letter noted Defendant's late payments and required pre-payment to complete testing and production of the three batches. Plaintiff alleges that Defendant refused to provide pre-payment and unilaterally arranged for Woodfield Distribution LLC, a TPL in Florida, to immediately take possession of the first batch. However, Defendant asserts that Bioglan's refusal to manufacture the wound gel was beyond Defendant's control as Bioglan had wrongfully breached and terminated the manufacturing agreement in place. In addition to the difficulties with Bioglan, Plaintiff also alleges that Defendant's actions in threatening Woodfield Pharmaceutical with litigation terminated the possibility of any relationship with Woodfield Pharmaceutical. However, Defendant argues that its relationship with Woodfield Pharmaceutical soured due to concerns about misuse or improper disclosure of Defendant's proprietary wound gel information.

In light of the apparent difficulties with the CMOs, on December 30, 2014 Plaintiff sent Defendant a letter terminating the DA and demanding that Defendant allow Plaintiff to order the wound gel directly from a CMO pursuant to certain provisions of the DA. On that same day, Defendant e-mailed Plaintiff stating that Bioglan had agreed to manufacture the wound gel until October 2015. However, it does not appear that Bioglan resumed production of the wound gel after making the second batch. It seems that after receiving Plaintiff's December 30, 2014 letter

2

Defendant continued to explore the possibility of working with Bioglan using Woodfield Pharmaceutical as an intermediary, but these efforts failed, and in February 2015 Defendant asked Woodfield Pharmaceutical to destroy all confidential information of Defendant relating to the wound gel.  Plaintiff claims Defendant did not allow Plaintiff to deal directly with Bioglan unless certain conditions were met.  To date, Plaintiff has still not received the three batches of wound gel that it ordered, but it appears that at least one of the batches is being held by the Food and Drug Administration ("FDA").

In addition, at some point before the DA was executed Defendant spoke with the New Jersey Board of Pharmacy at Plaintiff's request in order to expedite the processing of a license Plaintiff required to market and distribute the wound gel.  According to Plaintiff, after receiving the December 30, 2014 Notice of Termination, Defendant communicated false information to the New Jersey Board of Pharmacy regarding the termination of the DA and Plaintiff's right to market the wound gel.  Defendant claims that after the DA was terminated by Plaintiff, Defendant did not want to be in the position of vouching for Plaintiff before any regulatory body.

On February 20, 2015 Plaintiff filed an application for temporary restraints and preliminary relief as well as a Complaint asserting breach of contract, commercial disparagement, and tortious interference.  The Court granted the Temporary Restraining Order that same day, which was later extended with Defendant's consent.  On March 19, 2015 Defendant filed a Motion to Dismiss the Complaint, which was denied on June 9, 2015. Thereafter Defendant filed a third party complaint against Bioglan and asserted counterclaims against Plaintiff in its Answer.  On July 28, 2015 the Court conducted a preliminary injunction hearing and heard the testimony of a single witness, Joseph Perri, who is Plaintiff's Vice President.  Plaintiff asks the Court to enjoin Defendant from:

(1) instructing Bioglan or Woodfield Pharmaceutical LLC[1] to destroy Glyco's confidential information, including the information required to manufacture the wound gel;

(2) instructing Woodfield Distribution LLC to ship the wound gel in its possession outside the United States;

(3) advising any regulatory authorities in the United States including, but not limited to, the New Jersey Department of Health and the FDA, that Plaintiff is not authorized to market the wound gel.

(Pl.'s Proposed Order, ECF No. 2-2.)  Plaintiff also asks that the Court require Defendant to:

(4) advise Bioglan and Woodfield Pharmaceutical that Plaintiff is authorized to enter into agreements with them directly for the manufacture of the wound gel;

(5) cooperate with Plaintiff in entering into agreements with CMOs for the manufacture of the wound gel;

(6) cooperate with Plaintiff in entering into agreements with suppliers of chemicals and other materials such as tubes needed to manufacture the wound gel;

(7) cooperate with Plaintiff in seeking an extension of Defendant's patents and in maintaining all regulatory filings; and

(8) appoint someone other than Defendant's President to deal with Plaintiff on all issues involving the wound gel.

(*Id.*)

---

[1] On June 24, 2015 the Court granted in part Defendant's Motion to Dissolve a portion of the TRO and ordered the phrase "or Woodfield Pharmaceutical LLC" be stricken.  (Order, June 24, 2015, ECF No. 31.)

DISCUSSION

A.  Legal Standard

Preliminary injunctions are an "extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).  To obtain a preliminary injunction the moving party bears the burden of establishing that (1) he is likely to succeed on the merits of the underlying litigation, (2) he is likely to suffer irreparable injury in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *Id.*  The primary purpose of a preliminary injunction is to maintain the status quo pending a decision on the merits.  *See Acierno v. New Castle Cnty.*, 40 F.3d 645, 648 (3d Cir. 1994).  However, where, as here, the preliminary relief sought is a mandatory affirmative act that would change the status quo, "the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction."  *Bennington Foods LLC v. St. Croix Renaissance, Grp.*, LLP, 528 F.3d 176, 179 (3d Cir. 2008); *see also Acierno*, 40 F.3d at 647 (stating that a "party seeking a mandatory injunction . . . bears a particularly heavy burden in demonstrating its necessity"); *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (explaining that a party seeking a mandatory injunction must establish "a clear showing" of entitlement to the requested relief and "demonstrate a greater likelihood of success").

B.  Analysis

To obtain its requested preliminary relief, Plaintiff must first demonstrate a likelihood of success on its three claims: breach of contract, commercial disparagement, and tortious interference.  To satisfy this requirement, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief

5

to make a prima facie case showing a reasonable probability that it will prevail on the merits."

*LCN Enterprises, Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141, 145 (D.N.J. Mar. 14, 2002)

(quoting *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975)).  However, since Plaintiff asks the

Court to order Defendant to perform mandatory acts that would alter the status quo, Plaintiff

faces a heavier burden.  *See e.g., Acierno*, 40 F.3d at 647; *Tom Doherty*, 60 F.3d at 34.

A plaintiff establishes a prima facie contract breach if he demonstrates (1) a contract, (2)

breach of the contract, (3) damages, and (4) the plaintiff performed his own contractual

obligations.  *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).  Here Plaintiff has not

established a prima facie or clear showing of contract breach necessary for entitlement to the

injunctive relief sought.  Plaintiff asserts that Defendant, by refusing to allow Plaintiff to deal

directly with the CMOs, has breached Sections 7.3, 12.2.3, and 12.4 of the DA, which grant

Plaintiff the right to place orders directly with a CMO under certain conditions.  Section 7.3

states, in relevant portion, that

> Supplier [Defendant] and Distributor [Plaintiff] will jointly work in good faith to ensure
> an uninterrupted supply of the Product [wound gel] throughout the Term.  In the event
> supply of the Product is interrupted for any reason within Supplier's reasonable control,
> and Supplier does not remedy its default within thirty (30) days after written demand,
> Distributor, after reasonable attempts to resolve the supply issue, will have the right, so
> long as Supplier remains in default, to place orders directly with the CMO. . . .

(Compl. Ex. A, ECF No. 1-1).  Section 12.2.3 grants Plaintiff the right to terminate the DA upon

written notice if Plaintiff "reasonably determines that it is unlikely that Supplier will be able to

timely deliver Product ordered by Distributor in accordance with the provisions of this

Agreement." (*Id*.)  Section 12.4 states, in relevant part,

> In the event of termination due to Supplier's breach of its obligations hereunder,
> Distributor shall have, without further action, a license to the 510(k) for the Product for
> marketing and distribution in the Territory for the balance of the Term plus five (5)
> additional years, and Distributor shall have the right to place orders directly with the
> CMO for the Product.

(*Id.*)

Plaintiff submitted a document indicating that Bioglan terminated its relationship with Defendant on December 17, 2014, shortly after Plaintiff placed its first order of wound gel on December 1, 2014.  (Letter, ECF No. 1-3.)  Bioglan's termination letter states that it stopped manufacturing the wound gel "due to late payment" but would complete its obligations to manufacture and deliver the first three batches of wound gel "once pre payment has been received."  (*Id.*)  Plaintiff cites the letter for proof that Bioglan's refusal to continue manufacturing the wound gel was within Defendant's control.  Plaintiff also asserts that Defendant caused the relationship with Woodfield Pharmaceutical, another CMO, to sour by threatening it with litigation and accusing it of misconduct.  (Compl. Ex. H, ECF No. 1-8; Compl. Ex. I, ECF No. 1-9.)  According to Plaintiff, Defendant's deteriorating relationships with these two CMOs justified Plaintiff's December 30, 2014 termination of the DA under Section 12.2.3 and demand to deal directly with the CMOs under Section 12.4.  (Compl. Ex. M, ECF No. 1-13.)  In addition, because Plaintiff has still not received the three batches of wound gel it ordered and more than thirty days have elapsed since the December 30, 2014 written notice of Defendant's default, Plaintiff asserts that it may place orders for the wound gel with Defendant under Section 7.3.  Plaintiff alleges that Defendant, by not permitting Plaintiff to freely order wound gel directly from the CMOs, has breached Sections 7.3 and 12.4 of the DA.  (Compl. Ex. G, ECF No. 1-7.)

However, Defendant claims that Plaintiff's termination of the DA was inappropriate and has asserted a breach of contract counterclaim against Plaintiff.  (Answer, ECF No. 35.) Defendant claims that it paid all outstanding invoices to Bioglan and provided pre-payment. (Drizen Prelim. Inj. Certification ¶ 21; Pl.'s Prelim. Inj. Hr'g Ex. 4.)  Defendant also explains

that Section 7.3 is not triggered because Bioglan's termination of its manufacturing obligations was improper and the result of Bioglan's concerns about the lack of profitability of the wound gel, which are outside Defendant's control.  (Compl. Ex. E, ECF No. 1-5; Drizen Prelim. Inj. Certification ¶ 21; Drizen Prelim. Inj. Certification Ex. D.)  Defendant has accordingly filed a third-party complaint against Bioglan alleging contract breach.  (ECF No. 32.)  Furthermore, Defendant argues that Plaintiff's termination of the DA was premature because the December 17, 2014 letter states that Bioglan was willing to manufacture the three batches of wound gel ordered by Plaintiff, and Defendant continued to negotiate with Bioglan after receiving Bioglan's letter. On the day that Plaintiff terminated the DA, Defendant informed Plaintiff by e-mail that Bioglan had agreed to continue producing the wound gel until October 2015.  (Pl.'s Prelim. Inj. Hr'g Exs. 31, 38.)  Regarding Woodfield Pharmaceutical, it appears that Defendant's relationship with this entity deteriorated because of Defendant's concerns about Woodfield Pharmaceutical's improper disclosure of Defendant's proprietary information and cost disputes.  (Compl. Ex. E, ECF No. 1-8; Compl. Ex. I, ECF No. 1-9; Def.'s Conditional Motion to Dissolve, ECF No. 17.)  Although Woodfield sent an e-mail to Defendant terminating its relationship on December 27, 2014, it appears that days later on December 30, 2014 both parties retracted the termination of their agreement and apologized.  (Compl. Ex. K, ECF No. 1-11.)  It seems that up until February 2015 the parties continued to negotiate a potential supply arrangement and discussed the possibility of Bioglan manufacturing the wound gel for Defendant, with Woodfield Pharmaceutical acting as the intermediary.  (Prelim. Inj. Hr'g, ECF No. 39; Compl. Ex. L, ECF No. 1-12.)  Lastly, it appears that at least one batch of wound gel is currently being held by the FDA.  (Prelim. Inj. Hr'g, ECF No. 39; Pl.'s Prelim. Inj. Hr'g Ex. 39.)  At this point, given the number of other players involved, it is unclear (1) why Plaintiff has not yet received its three batches of wound

gel, (2) whether Defendant's actions, the CMO's actions, or outside events such as the FDA hold are the primary reason the wound gel has not been delivered, and (3) whether Plaintiff's termination and demand under Sections 7.3, 12.2.3.1, and 12.4 of the DA were warranted. Plaintiff has not established a likelihood of success on its breach of contract claim because it has not made a sufficient showing of Defendant's contract breach.[2]

In addition to breach of contract, Plaintiff also alleges commercial disparagement and tortious interference claims against Defendant.  To assert a commercial disparagement claim, a plaintiff must show "(1) publication; (2) with malice; (3) of false allegations concerning another party's property or product; (4) causing special damages." *Pactiv Corp. v. Perk-Up, Inc.*, 2009 WL 2568105, at *10 (D.N.J. Aug. 18, 2009) (citing *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1138 (3d Cir. 1977)).  Publication refers to the "communication of the allegedly libelous statement to a third person with a reasonable ground to suppose that it will become known to others." *Id.* at *11 (quoting *Palestri v. Monogram Models, Inc.*, 875 F.2d 66, 69–70 (3d Cir. 1989)).  "To allege malice . . . the claimant must allege facts to suggest that the accused knew the statements were false or that they were 'published with reckless disregard for their falsity.'" *Id*. at *10 (quoting *Floorgraphics, Inc. v. New America Mktg. In-Store Serv., Inc.*, No. 04-3500, 2006 WL 2846268, at *6 (D.N.J. Sept. 29, 2006)).  Plaintiff alleges that Defendant made false statements to the New Jersey Board of Pharmacy when Defendant stated that the DA was terminated and Plaintiff did not have authority to market and distribute the wound gel.  (Pl.'s Prelim. Inj. Hr'g Ex. 37; Drizen Prelim. Inj. Certification ¶ 11.)  Defendant explains that it did not make any false statements and that in light of its previous support of Plaintiff's application

---

[2] Defendant also asserts that Plaintiff failed to demonstrate that it performed its contractual obligations, the fourth required element of a contract breach claim.  However, the Court will not reach this issue since Plaintiff has not made an adequate showing of contract breach.

for a license before the Board, Defendant did not want to be in a position of vouching for Plaintiff before a regulatory agency after Plaintiff terminated the DA.  (Drizen Prelim. Inj. Certification ¶ 11.)  In light of the uncertainty surrounding the DA and the tangled relationships between the parties and the CMOs, it is not clear at this point that Defendant's statements to the Board were false.[3]  Thus Plaintiff has not demonstrated a likelihood of success on its commercial disparagement claim.

Lastly, to establish a tortious interference claim, a plaintiff must show "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) a causal connection between the interference and the loss of prospective gain, and (4) actual damages."  *Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751 (1989)).  "Malice" simply means wrongful, without justification or excuse; it does not require ill will.  *Id.* at 848 n.10.  "The reasonable expectation requirement does not require a contractual right."  *Id.*  Again at this point, given the entanglement of all the involved parties and their various claims, it is not clear that Defendant interfered intentionally and with malice in Plaintiff's relationships with the CMOs and the New Jersey Board of Pharmacy.  Thus Plaintiff has not presented sufficient evidence to establish likely success on its tortious interference claim.

Plaintiff has not established a likelihood of success on the merits of any of its three claims.  Therefore, the Court need not address the remaining factors for preliminary injunctive relief and will deny Plaintiff's Motion.

---

[3] For example, if, as Defendant alleges, Plaintiff breached the contract, Plaintiff inappropriately terminated the DA, or Defendant did not breach the contract, then Plaintiff's right to market the wound gel may have extinguished, and Sections 7.3 and 12.4 of the DA would not apply.

CONCLUSION

For the reasons above, the Court will deny Plaintiff's Application for Preliminary

Injunctive Relief.  An appropriate Order follows.

_/s/ Anne E. Thompson_
ANNE E. THOMPSON, U.S.D.J.